**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**FILED**

AUG 2 4 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

U.S. COMMODITY FUTURES TRADING :
COMMISSION, :
            :
            Plaintiff, :
            :
            :
    v.      :   CIVIL ACTION NO.: 1:12-cv-106-LY
            :
CHRISTOPHER B. CORNETT, :
            :
            Defendant. :
            :
            :
            :
            :

**ORDER OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, CIVIL**
**MONETARY PENALTIES, AND ANCILLARY EQUITABLE RELIEF AGAINST**
**DEFENDANT CHRISTOPHER B. CORNETT**

## I.    INTRODUCTION

On February 2, 2012, the U.S. Commodity Futures Trading Commission ("Commission") filed

a Complaint [D.E. 1] in this matter against Defendant Christopher B. Cornett ("Cornett") alleging that

Cornett violated, and unless enjoined would continue to violate, Sections 4b(a)(2)(A)-(C) of the

Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), and Commission

Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2012).  The Complaint alleged that, from at least June

2008 through at least October 2011, Cornett solicited individuals for a pooled investment ("pool") in

retail foreign currency contracts ("forex"), and that Cornett acted as the manager and operator of the

forex pool.  The Complaint went on to allege that Cornett: (1) made false representations in order to

solicit prospective pool participants to provide funds for the forex pool; (2) falsely reported profits from

trading forex and misrepresented pool participants' account balances in weekly reports / account

1

statements provided to pool participants; (3) misappropriated a substantial amount of pool participants' funds; and (4) operated a forex pool without being properly registered.

On April 10, 2012, the Commission served Cornett with the Summons and Complaint. [D.E. 4]. Cornett failed to file an answer or other responsive pleading, and the Commission obtained a Clerk's Entry of Default on May 4, 2012. [D.E. 6]. On July 9, 2012, pursuant to Fed. R. Civ. P. 55(b)(2), the Commission filed a Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Ancillary Equitable Relief Against Cornett ("Motion"). [D.E. 7].

The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, and the Motion, and being fully advised in the premises, hereby:

**GRANTS** the Commission's Motion and enters the following findings of fact and conclusions of law finding the Defendant liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Equitable Relief Against Defendant Cornett ("Order"), which determines that the Defendant has violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (Supp. III 2009), and Commission Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2012), and imposes on the Defendant a permanent injunction, remedial ancillary relief, including an order to pay restitution, and civil monetary penalties.

## II.    FINDINGS OF FACT

### A.  PARTIES

Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.*, (Supp. III 2009), as amended by Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010

("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 et al. ("Act, as amended") and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2012). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

Defendant **Christopher B. Cornett** resided in Buda, Texas during the relevant period. On January 8, 2003, the National Association of Securities Dealers ("NASD") "barred [Cornett] with association with any NASD member in any capacity" and ordered Cornett to pay restitution in the amount of $28,423.73 for signing a customer's name on the back of a check and using the funds for Cornett's personal benefit without the authorization, knowledge or consent of the customer. In addition, on April 30, 2003, the United States District Court for the Western District of Texas sentenced Cornett to a term of imprisonment of 37 months after Cornett pleaded guilty to five counts of bank fraud, in violation of 18 U.S.C. § 1344. Cornett has not been registered with the Commission since March 2001.

**B. The Defendant's Conduct**

**1. Cornett's Historical Performance Trading Forex Prior to Operation of Pool**

Shortly after Cornett's release from prison for bank fraud, Cornett began trading forex. Beginning in at least August 2006 and continuing until at least May 2007, Cornett solicited individuals to open up accounts at Global Forex Trading ("GFT"), and to provide Cornett with a Power of Attorney ("POA") to trade forex in these accounts on behalf of those individuals. During this time period, Cornett obtained a POA to trade five accounts at GFT on behalf of seven individuals (three individual accounts and two joint accounts). From August 2006 through January 2008, these individuals deposited a total of $62,000 into these individual trading

3

accounts, and Cornett lost over $60,600 trading forex. These individuals withdrew the remaining approximately $1,400 from the trading accounts. In October 2007, Cornett opened a trading account in his own name at GFT and deposited $13,500 into this account. From October 2007 through December 2007, he lost almost $13,000 trading forex in this account.

### 2. The Forex Pool Operated by Cornett

Beginning in at least June 2008 and continuing through at least October 2011, Cornett solicited individuals for a pooled investment in forex. Cornett was the manager and operator of this pool. The pool, at various times, was referred to as ITLDU, ICM, International Forex Management, LLC ("International Forex") and/or IFM, LLC ("IFM").

ITLDU is a partnership formed on May 15, 2007. According to the Partnership Agreement, Cornett and Kevin Nix ("Nix") are the general partners and the principal office is located in Austin, Texas. ITLDU has never been listed with the Commission in any capacity.

ICM is a partnership formed in January 2008. According to the Partnership Agreement, Cornett and Nix are the general partners, the partnership was formed "to invest in foreign exchange currency," and the principal office address is 1630 Wells Branch Parkway, Austin, Texas 78728. ICM has never been listed with the Commission in any capacity.

International Forex is a limited liability company formed in Texas on October 15, 2009. In the initial filing with the Texas Secretary of State, Cornett was listed as the Manager, Registered Agent and Organizer of the company. On April 16, 2010, a Certificate of Amendment was filed with the Texas Secretary of State, which substituted Lori McClure ("McClure") as the new Registered Agent, added Michael Pavlovsky as a Manager, and removed Cornett as a Manager. At all relevant times, Cornett was the de facto Manager of International

4

Forex.  International Forex has never been listed with the Commission in any capacity.

IFM is a limited liability company formed in Texas on January 8, 2010.  Nix is listed as

the Registered Agent and Organizer of the company, and Nix and McClure are listed as the

Managers of the company.  At all relevant times, Cornett was the de facto Manager of IFM.  IFM

has never been listed with the Commission in any capacity.

### a.  Solicitation of Funds from Prospective Pool Participants

In order to solicit individuals to provide funds for the pool operated by Cornett, Cornett

falsely represented to prospective pool participants that, while there were weeks when Cornett

either lost money or broke even trading forex, Cornett had never experienced a losing month or a

losing year trading forex.  Cornett also provided prospective pool participants with a username

and password to view online what Cornett told prospective pool participants was a "real" account

of a then-current pool participant.  The profits and account balances reported in this "real"

account were false.

Participants who invested funds in the pool operated by Cornett generally executed

subscription agreements.  The subscription agreements generally noted that Cornett was the

"Manager" of the pool which, as noted above, was referred to at various times as ITLDU, ICM,

International Forex Management, LLC and/or IFM, LLC.  The subscription agreements also

generally stated that the purpose and character of the business was to make investments in

foreign exchange currency and to engage in any other business or activities related or incidental

thereto.  The subscription agreements generally stated that the profits generated from trading

forex would be split, with the pool participant receiving 75%, and Cornett, the pool operator,

receiving 25%.

Cornett provided pool participants with a username and password so that participants could view the status of their pooled investment online. Cornett updated each pool participant's account on a weekly basis and reported each pool participant's share of the profits or losses from the pool's forex trading, any deposits into or withdrawals from the pool participant's account, and the pool participant's account balance.

Beginning in approximately September 2009 and continuing through at least October 2011, Cornett solicited prospective pool participants to invest retirement funds in the pool operated by Cornett. Heidi Beyer ("Beyer") and Global Wealth Management Group, LLC ("Global Wealth"), a Nevada limited liability company formed in August 2009, with the knowledge, consent and authorization of Cornett, also solicited individuals to invest retirement funds in the pool operated by Cornett. Beyer and Global Wealth made claims similar to Cornett's claims about Cornett's prior historical performance trading forex, and Beyer and Global Wealth also provided prospective pool participants with a username and password to view the "real" account that contained false profits and account balances for a then-current participant in the pool.

Pool participants who invested retirement funds in the pool operated by Cornett generally provided funds to Global Wealth directly, or through a third party trust company. These funds were then provided to Cornett to trade in the forex pool.

### b. Disposition of Funds Solicited Between June 2008 and September 2010 and Summary of False Account Statements Provided During This Period

During the period from June 18, 2008 through September 2010, Cornett solicited from pool participants, personally and through Beyer and Global Wealth, approximately $7.07 million, pool participants redeemed approximately $1.64 million and Cornett lost approximately

$4.17 million of the pool's funds trading forex at Forex Capital Markets ("FXCM") and Forex Capital Markets Ltd., U.K. ("FXCM UK").

During this period, Cornett traded the pool's funds at FXCM in accounts in the names of ITLDU and ICM, and at FXCM UK in accounts in the name of ICM. Cornett also traded the pool's funds at both FXCM and FXCM UK in accounts in the name of McClure (who, as noted above, was listed as the Registered Agent of International Forex and a Manager of IFM in documents filed with the Texas Secretary of State).

During this period, Cornett had only one profitable month trading forex with pool funds and, as a result, Cornett earned little, if any, fees for acting as the operator of the pool. As a result, Cornett misappropriated approximately $1.26 million of the pool's funds during this time period.

From June 18, 2008 through at least September 2010, most, if not all, of the weekly reports / account statements that were provided to participants by Cornett through the posting of information to the pool participants' online accounts were false, because the profits, losses and account balances in these reports / statements were false.

### c. Disposition of Funds Solicited Between October 2010 and October 2011

From October 2010 through October 2011, Cornett solicited, personally and through Beyer and Global Wealth, an additional approximately $6.95 million from pool participants to trade forex, and pool participants redeemed an additional approximately $2.22 million from the pool. Cornett transferred $3.37 million of these funds to forex trading accounts at FXCM UK, Deutsche Bank AG ("dbFX"), Dukascopy Bank SA ("Dukascopy"), Smart Trade FX ("Smart Trade"), Forex Place Ltd., a/k/a 4xp, a/k/a 4xp.com ("4xp") and FinFX Trading Oy ("FinFX").

As noted in the Complaint, Cornett lost approximately $299,000 at FXCM UK, $1.26 million at dbFX, and $250,000 at Dukascopy trading forex.

Subsequent to the filing of the Complaint, the Commission obtained account records and interviewed representatives from Smart Trade. According to domestic bank records obtained by the Commission and information and account records provided by Smart Trade, Cornett transferred $118,000 of pool funds to Smart Trade and lost all but $74 trading forex.

The Commission was also able to review an account statement that appears to be from 4xp that was obtained during the course of the execution of a search warrant at Cornett's residence.[1] Domestic bank records obtained by the Commission establish that Cornett transferred $483,950 of pool funds to 4xp and that Cornett withdrew $111,472 from the 4xp trading account. The 4xp account statement that was obtained during the course of the execution of a search warrant shows that Cornett had a zero balance as of August 2011. Accordingly, it appears that Cornett lost $372,478 of the pool's funds at 4xp.[2]

Finally, despite diligent attempts, the Commission has been unable to secure account statements from FinFX. Domestic bank records, however, establish that Cornett transferred a total of $955,000 of pool funds to FinFX trading accounts, and that he withdrew $50,000 from the FinFX trading accounts. Based on Cornett's historical performance trading forex, it is likely

---

[1] The Commission, after making several diligent attempts, also recently secured account records directly from 4xp. Unfortunately, these account records are in large part unreadable and confusing.

[2] The 4xp records obtained from the search warrant do not reconcile to the bank records obtained by the Commission, and these records are also internally inconsistent. The transaction details in 4xp's account statement show that deposits total $620,100 and withdrawals total $376,772, and that there was a $0 balance as of August 2011. Thus, it would appear that the total trading losses would have to be $243,328. On the summary page of the account statement, however, it states that the total deposits and withdrawals amounted to $287,465, and that the trading losses also totaled $287,465, which resulted in a $0 balance as of August 2011. Regardless, it appears that all pool funds that were deposited into and not withdrawn from the forex trading account at 4xp ($372,478), were lost.

that Cornett lost most, if not all, of the funds in the accounts at FinFX trading forex.

As a result of the losses sustained by Cornett, Cornett earned little, if any, fees for acting as the operator of the pool. As of October 2011, less than $520,000 of the pool's funds remained in bank accounts in the names of ITLDU, ICM, International Forex, IFM and Cornett. Accordingly, Cornett misappropriated approximately $1 million of the pool's funds during this time period.

### d. Failure to Register as a Commodity Pool Operator

Because Cornett was acting as a commodity pool operator ("CPO") from October 18, 2010 through at least October 13, 2011, he was required to be registered as a CPO. As of October 13, 2011, Cornett had failed to register as a CPO as required by the Act and Regulations.

### III.    CONCLUSIONS OF LAW

Under Fed. R. Civ. P. 55(a), a default is entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . ." Fed. R. Civ. P. 55(a). "A default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules," and an "entry of default is what the clerk enters when the default is established by affidavit or otherwise." *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). "After defendant's default has been entered, plaintiff may apply for a judgment based on such default. This is a default judgment." *Id.*

Fed. R. Civ. P. 55(b) provides that judgment by default may be entered by a district court. Fed. R. Civ. P. 55(b)(2). "Where a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party." *Natures Way Marine, LLC v. North American Materials, Inc.*, No. 08-0005-WS-B, 2008 WL 801702, at *2 (S.D. Ala. Mar.

24, 2008) (emphasis omitted) (*quoting F.T.C. v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 205, 208 (S.D.N.Y. 2002)). Further, the clerk's entry of default causes all well-pleaded allegations of facts to be deemed admitted. *J & J Sports Prods., Inc. v. Papania*, 2010 WL 1191807, at *2 (W.D. La. Mar. 26, 2010). Thus, if a district court determines that a defendant is in default, then the factual allegations in the complaint, except those relating to the amount of damages, will be taken as true. *See Sampson v. Brewer, Michaels & Kane, LLC*, No. 2010 WL 2432084, at *1 (M.D. Fla. May 26, 2010) ("[t]he effect of the entry of a default is that all of the factual allegations in the Complaint are taken as true, save for the amount of unspecified damages. Thus, if liability is well-plead in the complaint, it is established by the entry of a default.") (*citing Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)). Moreover, "[i]t is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12 (1944).

In this matter, a Clerk's Entry of Default has been entered against Cornett pursuant to the Commission's Request. [D.E. 5]. As such, in accordance with Fed. R. Civ. P. 55(b)(2), the allegations in the Complaint [D.E. 1] will be taken as true and a default judgment is hereby entered against the Defendant.

### A. Jurisdiction

The Court has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, 7 U.S.C. § 2(c)(2) (Supp III 2009). Section 6c(a)of the Act authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, in that the Defendant transacted business in the Western District of Texas, and the acts and practices in violation of the Act occurred within this District, among other places.

### B. The Commodity Exchange Act

In analyzing the Commission's Motion for Default Judgment, the Court is mindful that a crucial purpose of the Act is "protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1329 (11th Cir. 2002). "*[C]aveat emptor* has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments." *Id.* at 1334.

### 1.  Violations of Section 4b(a)(2)(A)-(C) of the Act

Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order

11

or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

From at least June 18, 2008 through at least September 2010, Cornett violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), by, among other things: (i) fraudulently soliciting pool participants or prospective pool participants; (ii) making, causing to be made, and distributing reports and statements to pool participants or prospective pool participants that contained false information; and (iii) misappropriating pool participants' funds.

### a.  Solicitation Fraud

Cornett violated Section 4b of the Act by willfully making material false statements to prospective pool participants in order to solicit funds for the forex pool.  False statements made to solicit prospective pool participants constitute a violation of Section 4b. *See Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 111 (2d. Cir. 1986) (*citing Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 103-04 (7th Cir. 1977)).  In soliciting prospective pool participants, Cornett falsely represented prior historical results from his forex trading and also provided prospective pool participants with a false account history for a then current pool participant that contained false profits, losses and account balances.

### b.  False Account Statements

Cornett also violated Section 4b of the Act by willfully providing false account statements to participants.  Delivering, or causing the delivery of, false account statements to pool participants constitutes a violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B). *See, e.g., CFTC v. Weinberg,* 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003) (false and misleading

statements as to the amount and location of investors' money violated Section 4b(a) of the Act);

*CFTC v. Noble Wealth Data Info. Servs., Inc.,* 90 F. Supp. 2d 676, 685-87 (D. Md. 2000), *aff'd*

*sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) (defendants violated Section 4b(a) of

the Act through the delivery of false account statements); *CFTC v. Skorupskas*, 605 F. Supp.

923, 932-33 (E.D. Mich. 1985) (finding that defendant violated Section 4b(a) by issuing false

monthly statements to customers).   Here, Cornett provided weekly account statements to the

pool participants that falsely reported profits, losses and account balances.

### c.  Misappropriation

Finally, Cornett violated Section 4b of the Act by willfully misappropriating at least

approximately $2.26 million of pool participants' funds.  Misappropriation of pool participant

funds constitutes "willful and blatant" fraud in violation of Sections 4b(a)(2)(A) and (C) of the

Act.  *Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d at 687, *rev'd in part (on other*

*grounds), Baragosh*, 278 F.3d 319 (4th Cir. 2002), *cert denied*, 537 U.S. 950 (2002) (defendants

violated Section 4b(a)(2)(i) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting

investor funds for operating expenses and personal use); *see also Skorupskas*, 605 F. Supp. at

932 (holding that defendant violated Section 4b when he misappropriated pool participant funds

by soliciting funds for trading and then trading only a small percentage of those funds, while

disbursing the rest of the funds to investors, herself, and her family); *Weinberg*, 287 F. Supp. 2d

at 1106 (misappropriating investor funds violated Section 4b(a)(2)(i) and (iii) of the Act); *In re*

*Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,315 (CFTC July

19, 1999), *aff'd* in relevant part *sub nom.*, *Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000)

(respondents violated Section 4b by surreptitiously retaining money in their own bank accounts

that should have been traded on behalf of participants); *CFTC v. King,* No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) ("King's violation of section 4b(a)(2)(i), (iii) of the CEA is further proven by his admitted misappropriation of customer funds for personal and professional use."); *CFTC ex rel Kelley v. McLaurin*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,768 at 44,180 (N.D. Ill. 1996) (by depositing customer funds in accounts in which the customers had no ownership interest and making unauthorized disbursements for his own use, defendant violated Section 4b of the Act).

### 2. Violation of Regulation 5.3(a)(2)(i)

For the purposes of trading forex, a "commodity pool operator" ("CPO") is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2012), as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant, and that engages in retail forex transactions. Here, Cornett solicited funds for a pooled investment vehicle that was not an eligible contract participant and that engaged in retail forex transactions from June 2008 through at least October 2011. Beginning on October 18, 2010, Cornett was required to be registered as a CPO pursuant to Regulation 5.3(a)(2)(i),17 C.F.R. § 5.3(a)(2)(i) (2012).

From October 18, 2010 through at least October 13, 2011, Cornett failed to register as a CPO. Accordingly, Cornett violated Regulation 5.3(a)(2)(i),17 C.F.R. § 5.3(a)(2)(i) (2012).

### C. There is a Reasonable Likelihood of Continued Misconduct by the Defendants

In order to obtain permanent injunctive relief in an action under Section 6c of the Act, the Commission must not only establish that a violation of the Act has occurred, but also that there is a reasonable likelihood of future violations. *See CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.

1979), *cert. denied* 442 U.S. 921 (1979) (finding that "[o]nce a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations" under Section 6c of the Act).  To be sure, while past misconduct does not require the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations."  *CFTC v. Hunt*,  591 F.2d 1211, 1220; *see also CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988) ("[t]he likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing") (citation omitted); *cf. SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) ("the [Securities and Exchange] Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a 'reasonable likelihood' of future transgressions"), *cert. denied sub nom.,* 454 U.S. 1124 (1981) (citations omitted);  *Hunt*, 591 F.2d,at 1219-20 (reversing the district court's denial of injunctive relief, and stating that a court of appeals should not hesitate "to reverse an order denying [injunctive] relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved.") (internal quotation marks and citation omitted).

Here, the Commission has made a showing that Cornett has engaged in acts and practices that violated Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), and Regulation 5.3(a)(2)(i),17 C.F.R. § 5.3(a)(2)(i) (2012).  Based on the egregiousness of the conduct in this matter, Cornett's prior conduct for which he was sanctioned by NASD, and Cornett's conviction for bank fraud for which he served a term of imprisonment of 37 months, it

is clear that, unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendant will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.    REMEDIES

### A. Permanent Injunction

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commission has made a showing that the Defendant has engaged in acts and practices which violated Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (Supp. III 2009), and Regulation 5.3(a)(2)(i),17 C.F.R. § 5.3(a)(2)(i) (2012).  Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendant will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act.  Based on the conduct described above, the Court enters an injunction against the Defendant permanently restraining, enjoining, and prohibiting him from directly or indirectly:

1. Engaging in conduct that violates Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (Supp. III 2009), and Regulation 5.3(a)(2)(i),17 C.F.R. § 5.3(a)(2)(i) (2012);

2. Engaging in any activity involving:

   a.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

   b.    Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), security futures products, and/or foreign

currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as

amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for his own

personal account or for any account in which he has a direct or indirect interest;

c.    Having any commodity futures, options on commodity futures, commodity

options, security futures products, and/or forex contracts traded on his behalf;

d.    Controlling or directing the trading for or on behalf of any other person or entity,

whether by power of attorney or otherwise, in any account involving commodity

futures, options on commodity futures, commodity options, security futures

products, and/or forex contracts;

e.    Soliciting, receiving or accepting any funds from any person for the purpose of

purchasing or selling any commodity futures, options on commodity futures,

commodity options, security futures products, and/or forex contracts;

f.    Applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

g.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R.

§ 3.1(a) (2012)), agent or any other officer or employee of any person (as that

term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered,

exempted from registration or required to be registered with the Commission

except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

## B. Restitution

### 1. The Court Has Authority to Order Restitution

As discussed above, Section 6c of the Act, 7 U.S.C. § 13a-1, authorizes the Commission

to bring an action to enjoin violations of, and enforce compliance with the Act.  In a civil

enforcement action brought pursuant to Section 6c, the district court may also order ancillary

equitable relief that it deems appropriate, including restitution and disgorgement.  *CFTC v.*

*Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("[i]t is well settled that

equitable remedies such as disgorgement are available to remedy violations of the [Act]");

*United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760-61 (6th Cir. 1999)

("[r]estitution and disgorgement are part of the court's traditional equitable authority").

This authority is founded on the well-established legal principle articulated by the

Supreme Court in *Porter v. Warner Holding Co.*:

> Unless otherwise provided by statute, all the inherent equitable
> powers of the District Court are available for the proper and
> complete exercise of that jurisdiction.  And since the public
> interest is involved in a proceeding of this nature, those equitable
> powers assume an even broader power and more flexible character
> than when a private controversy is at stake.  Power is thereby
> resident in the District Court, in exercising this jurisdiction, "to do
> equity and to mould each decree to the necessities of the particular
> case."

*Porter*, 328 U.S. 395, 398 (1946) (citations omitted).

### 2. Restitution Will be Measured in Amount of Participants' Losses

The object of restitution is to restore the status quo and return the parties to the positions

they occupied before the transactions at issue occurred.  *Porter*, 328 U.S. at 402 (equitable

restitution consists of "restoring the status quo and ordering the return of that which rightfully

belongs to the purchaser or tenant"); *United States v. Long,* 537 F.2d 1151, 1153 (4th Cir. 1975) (restitution consists of restoring the injured party "to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money") (quoting Restatement of Restitution, § 1, Comment: a, at 12 (1937)); *see also SEC v. AMX Int'l, Inc.,* 7 F.3d 71, 74–75 (5th Cir.1993) ( "[r]estitution . . . has the goal of making the aggrieved party whole"); *First Penn Corp. v. FDIC,* 793 F.2d 270, 272 (10th Cir.1986) ("[t]he object of restitution is to return the parties to the position that existed before the transaction occurred").

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *CFTC v. Noble Wealth Data Systems, Inc.,* 90 F. Supp.2d 676, 693 (D. Md. 2000; *see also CFTC v. Marquis Fin. Mgmt. Systems, Inc.,* 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); *CFTC v. Rosenberg,* 85 F. Supp. 2d 424, 455 (D.N.J. 2000) (ordering restitution in amount of customer deposits). *But see CFTC v. Wilshire Inv. Mgmt. Corp.,* 531 F.3d 1339, 1343–45 (11th Cir. 2008) (holding in a case involving fraudulent solicitation only, that the proper measure of restitution is the defendant's unjust enrichment).

Here, during the time period from June 2008 through October 2011, Cornett solicited approximately $14.02 million from pool participants and pool participants redeemed approximately $3.86 million. Accordingly, the proper measure of restitution in this matter is $10.16 million.

### 3. Payment of Restitution

The Court orders Cornett to pay restitution in the amount of $10.16 million, plus post-judgment interest, immediately. Post-judgment interest shall accrue on the Restitution

Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendant's pool participants, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendant and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

Defendant shall make Restitution Obligation payments under this Order to the Monitor in the name "Christopher B. Cornett – Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter that identifies the Defendant and the name and docket number of this proceeding. Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendant's pool participants identified by the Commission/CFTC or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative

cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission/CFTC following the instructions for civil monetary penalty payments set forth in Part C. below.

Defendant shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendant's pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendant shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant's pool participants during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The amounts payable to each Participant shall not limit the ability of any Participant from proving that a greater amount is owed from Defendant or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any Participant that exist under state or common law.

Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each Participant of Defendant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of

the restitution that has not been paid by Defendant to ensure continued compliance with any

provision of this Order and to hold Defendant in contempt for any violations of any provision of

this Order.

　　To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendant's

Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in

accordance with the procedures set forth above.

## C. Civil Monetary Penalty

### 1. Calculation of Penalty

　　As outlined above, the Court has jurisdiction to impose a Civil Monetary Penalty

("CMP") of "not more than the greater of [$130,000 for each violation occurring prior to October

23, 2008 and $140,000 for each violation occurring on or after October 23, 2008],[3] or triple the

monetary gain to the [Defendant] for each violation." 7 U.S.C. §13a-1 (2006). The Court is free

to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act

as a deterrent. *Miller v. CFTC,* 197 F.3d 1227, 1236 (9th Cir. 1999). "In determining how

extensive the fine for violations of the Act ought to be, courts and the Commission have focused

upon the nature of the violations." *Noble Wealth*, 90 F. Supp. 2d at 694. Conduct that violates

the core provisions of the Act, such as customer fraud, should be considered extremely serious.

*JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). In *JCC, Inc.*, the U.S. Court of

Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary

penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system –

such as manipulating prices or defrauding customers *should be considered very serious* even if

---

[3] *See* Regulation 143.8(a)(1)(iii)-(iv), 17 C.F.R. § 143.8(a)(1)(iii)-(iv) (2012).

there are mitigating facts and circumstances." *Id.* at 1571 (internal quotation marks and citation omitted) (emphasis added). In the case at hand, there are no mitigating facts or circumstances. Instead, Cornett was blatant and malicious in his fraudulent conduct.

The Commission has requested that the Court impose a serious and significant sanction and order the Defendant to pay a CMP of triple the monetary gain, i.e., triple the amount of money misappropriated. The Court agrees that a serious and significant sanction should be imposed and the Court will order Cornett to pay a penalty of $6.78 million (the "CMP Obligation"), which represents three times the monetary gain. *See CFTC v. Hayes*, 2007 WL 858772 at *5 (E.D. Va. Mar. 13, 2007) (imposing penalty of triple the monetary gain).

### 2. Payment of Penalty

The Defendant shall pay the CMP Obligation immediately and post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961.

Defendant shall pay his CMP Obligation by electronic funds transfer, or by U.S. Postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> Attn: Accounts Receivables – AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, Oklahoma 73169
> Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, Defendant shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Defendant shall accompany payment of the penalty with a cover letter that identifies the Defendant and the name and docket number of the proceedings.  The Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

### D.  Miscellaneous Provisions

**Equitable Relief:**  The injunctive and equitable relief provisions of this Order shall be binding upon the Defendant and upon any persons who are acting in the capacity of agent, officer, employee, servant, attorney, successor and/or assign of the Defendant, and upon any person acting in active concert or participation with the Defendant who receives actual notice of this Order by personal service or otherwise.

**Notices:**  All notices required to be given to the CFTC by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Director of Enforcement
Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

**Continuing Jurisdiction of this Court:**  This Court shall retain jurisdiction of this case to assure compliance with this Order and for all other purposes related to this action.

**SO ORDERED**, this _29th_ day of _August_, 2012, at Austin, Texas.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE